**IN THE UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| JOE BOYLES, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| EQUAL EMPLOYMENT | ) |
| OPPORTUNITY COMMISSION, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | )  **Case No. 05-CV-464-TCK-FHM** |
| | )        **Lead Case** |
| AG EQUIPMENT CO., | ) |
| | ) |
|      Defendant. | ) |

**OPINION AND ORDER**

Before the Court is Defendant AG Equipment Co.'s Motion for Summary Judgment (Docket No. 49); and Motion of Plaintiff EEOC and Plaintiff Joe Boyles for Partial Summary Judgment (Docket No. 42).

**I.      Factual Background**

*The Parties*

In Case No. 05-CV-464, Plaintiff Joe Boyles ("Plaintiff"), a 59-year-old white male, alleges he was terminated based on his age, in violation of the Age Discrimination in Employment Act ("ADEA") and in violation of Oklahoma public policy.[1]  Plaintiff worked for Defendant AG Equipment Co. ("AG") for approximately sixty days, from early October 2003 to early December 2003.  In Case No. 05-CV-477, the Equal Employment Opportunity

---

[1] The Court uses the word "termination" throughout this Order to refer to Plaintiff's departure from employment with AG.  The Court recognizes that AG disputes that Plaintiff was actually terminated.

1

Commission ("EEOC") seeks damages for Plaintiff Joe Boyles and seeks injunctive relief prohibiting AG from committing further acts of age discrimination.  The two cases have been consolidated for all purposes.

Defendant AG is in the business of designing and building packages for gas compressors, which are used to move volumes of gas at pressure conditions.  AG was formed by Grady Ash ("Ash") in 1979.  Ash is seventy-two (72) years old.  Ash is the owner, majority shareholder, and Chief Executive Officer of AG.  Ash does not have direct responsibility for hiring or terminating any employees, although he is consulted if there is an "issue" that needs to be discussed.  (Deposition of Grady Ash ("Ash Depo."), Def.'s Mot. for Summ. J., Ex. B. 18:22-25.)

Charley Bright was the Shop Superintendent at the time Plaintiff was hired.  Charley Bright worked at AG from around 1998 to late October 2003.  As Shop Superintendent, Charley Bright was responsible for overseeing all work done in the shop and hiring and firing shop employees.  Charley Bright came to work at AG late in his career, after he had already worked in similar supervisory positions for many years.  Charley Bright is seventy-one (71) years old.[2]

_The Skid Department_

The base, or platform, of a package for a gas compressor is called a "skid."  AG manufactures skids in its shop.  In order to manufacture a skid, pieces of fabricated steel

---

[2]  Charley Bright is the father of Kent Bright.  Kent Bright is the President and Chief Operating Officer of AG.  Kent Bright has worked at AG for sixteen years and has been President for five years.  Ash and Kent Bright originally hired Charley Bright to supervise a construction project and then asked him to stay and serve as Shop Superintendent.

must be welded together.  The Skid Department was comprised, during relevant times, of twelve individuals.  Most of these individuals performed the task of welding.  Like other departments at AG, the Skid Department has a "lead man," who leads the department and reports to the Shop Superintendent.

Prior to Plaintiff being hired in October 2003, the person serving as lead man in the Skid Department was injured.  After this happened, Ash, Kent Bright, Charley Bright, and Waller discussed Tim Conner ("Conner") serving as the new lead man in the Skid Department.  Charley Bright was supposed to "execute that directive."  (Ash Depo. 43:16-25.)  Charley Bright, however, never told Conner that he was the lead man.  Charley Bright had reservations about Conner serving as lead man because he believed Conner's working on an elevated platform away from the welders made him "isolated" and unable to "be there one-on-one to answer questions."  (Deposition of Charley Bright ("Charley Bright Depo."), Ex. D to Def.'s Mot. for Summ. J., 62-64.)  According to Charley Bright, he and Ash were "a little bit at odds" over whether Conner should serve as lead man of the Skid Department. (*Id.* at 63:1-3.)

*Early October 2003*

    *1.    Charley Bright Hires Plaintiff*

Charley Bright had previously supervised Plaintiff as a welder at three different companies and had known Plaintiff for many years.  When Plaintiff learned Charley Bright was the Shop Superintendent at AG, Plaintiff approached Charley Bright about working for AG.  Plaintiff filled out an application for employment with AG on September 26, 2003.  In early October 2003, Plaintiff met with Charley Bright at AG's offices to discuss employment.  Based on Charley Bright's prior experience with Plaintiff, Charley Bright was

of the opinion that Plaintiff had an "excellent background" in welding.  Charley Bright hired

Plaintiff to begin employment on October 6, 2003.

Plaintiff was hired as a welder in the Skid Department, with the understanding that

Plaintiff would eventually become the lead man of the Skid Department.  (*See* Ash Dep.

44:10-16; Charley Bright Dep. 65:8-11; Deposition of Joe Boyles ("Boyles Dep."), Ex. A

to Def.'s Mot. for Summ. J., 33:4-5.)  Charley Bright's notes on Plaintiff's employment

application state Plaintiff's "position" as "welder-lead man." (Application for Employment,

Ex. 26 to Def.'s Mot. for Summ. J.)  Charley Bright and Plaintiff agreed, however, that

Plaintiff would not start out performing the duties of a lead man and would not be introduced

to the crew as the lead man.[3]  Plaintiff was hired at the wage of $21.00/hour, which was

considered "top wage" for a welder at AG.  At some point in time during the hiring process,

Charley Bright consulted Ash regarding Plaintiff's employment and rate of pay.  (*See* Ash

Dep. 30:6-31:25; Charley Bright Dep. 43:24-45:1.)

    2.    *Ash's Comment*

When Plaintiff was at the AG plant to discuss employment with Charley Bright, Ash

encountered Plaintiff and Charley Bright in the break room.  Ash made a comment to

Plaintiff regarding Plaintiff being "too old" to work in the Skid Department.  Specifically,

Plaintiff testified:  "He shook my hand and - and he asked - he was looking me straight in

---

[3] Although Charley Bright had the intention of making Plaintiff lead man,
Charley Bright did not "rule out" the possibility of Conner becoming lead man,
depending on the outcome of Plaintiff's probationary period.  (Charley Bright Dep.
64:23-65:7.) Ash's understanding was that Plaintiff was hired to eventually "replace"
Conner, who, in his mind, was currently serving as lead man of the Skid Department.
(Ash Dep. 44:10-13.)  Charley Bright's understanding was that he himself would
complete the duties of "lead man" during Plaintiff's probationary period.  (Charley
Bright Dep. 62:17-21.)

the eyes and he asked me how old I was, and I told him.  And he said to me, he said, 'I told Charley Bright not to be hiring old people around here, we need young people.'"  (Boyles Dep. 45:6-11.)  Ash testified:  "And I  looked at Joe, and I said, How old are you?  He said I'm 59.  And I said, That's too old to work in our skid department.  And Charlie [sic] said, You can't ask somebody that, Grady.  I said, I know it."  (Ash Dep. 30:18-25.)[4]

*October 6, 2003 - Plaintiff Begins Employment with AG as a Welder*

Plaintiff began employment as a welder in the Skid Department on October 6, 2003. Plaintiff was hired as a probationary employee, which was standard procedure at AG and in the welding industry.  AG's probationary period for all employees was sixty days.  During the time of Plaintiff's employment, which was approximately two months, Plaintiff worked only as a welder and never performed the tasks of a lead man.

*Mid-October 2003 - Charley Bright's Departure from AG*

In mid-October 2003, soon after Plaintiff started working, Charley Bright and Ash had a discussion regarding Charley Bright's employment with AG.  Charley Bright testified that he "voluntarily left" AG after this discussion.  (Charley Bright Dep. 92:19-93:14.) Steve Waller ("Waller") was the Assistant Shop Superintendent when Charley Bright left AG.  Waller was promoted to Shop Superintendent, and Waller was the Shop Superintendent at the time of Plaintiff's termination in December 2003.

---

[4] The parties dispute when the two events described above - the hiring decision and Ash's comment - occurred in relation to each other.  AG contends it is undisputed that the hiring decision was made *after* Ash's comment, thereby rendering the comment of less importance.  Plaintiff contends it is undisputed that the hiring decision was made *before* Ash's comment, thereby rendering the comment of more importance in light of Ash's other actions.  The Court has spent considerable time attempting to pin down the precise timeline of events from the record but concludes there is a genuine issue of fact as to the precise timing of these hiring events.

<u>*October 28, 2003 - Ash's Request for Depth Chart*</u>

Around the end of October, Ash asked Conner, whom he considered to be the lead man of the Skid Department, how Plaintiff was performing. Conner stated that he thought Plaintiff "would be okay once he learned how [AG] did things." (Ash Dep. 38:9-11.) Because Plaintiff had been "touted as a man that was the best welder in town" with "great supervisory skills," Conner's sub-standard review of Plaintiff's performance caused Ash concern. (*Id.* 38-39.) On October 28, 2003, at 4:30 in the afternoon, Ash asked Conner to complete a "depth chart" in which Conner ranked all members of the Skid Department from first to last in order of performance. Ash's purpose in requesting the depth chart was to evaluate Plaintiff, and not other members of the Skid Department. (*Id.* 39-40.) During this conversation, Conner learned for the first time that he was the "lead man" of the Skid Department.

Conner completed the chart that evening and returned it to Ash the next morning along with a cover letter explaining the criteria Conner used for his ranking. (Ex. 1 to Def.'s Mot. for Summ. J.) The letter also thanked Ash for naming him lead man and promised to lead to the best of his ability. (*Id.*) Plaintiff was ranked ten out of twelve on the depth chart. (Ex. 2 to Def.'s Mot. for Summ. J.) The depth chart contains no explanation and consists merely of names and rankings. (*Id.*)[5]

---

[5] Apparently, the ages of the ranked individuals were written in on the depth chart for purposes of the litigation, but these ages were not on the depth chart when Conner completed it. (*Id.*)

*October 31, 2003 - Ash's First Meeting with Plaintiff Regarding Performance*

Ash was "shocked" at Plaintiff's tenth-place ranking on the depth chart. (Ash Dep. 49:9-12.) On October 31, 2003, Ash called Plaintiff to his office with the intent of terminating him. During this conversation, Plaintiff informed Ash that Plaintiff was not aware that Conner was his supervisor. Ash was surprised that his decision to name Conner lead man had not been carried out and that members of the crew did not know Conner was their supervisor. Ash elected not to terminate Plaintiff. However, Ash challenged Plaintiff to "get up to the top" and to "go talk to Tim." (Boyles Dep. 80:4-6.)

*Late November 2003 - Ash's Second Meeting with Plaintiff Regarding Performance*

Approximately one month later, Plaintiff testified that he met with Ash again regarding his performance. (Boyles Dep. 82:21-83:8.) Ash told Plaintiff he had "moved up the ladder" but he still was "not performing like [the] star that [he] was supposed to have been." (*Id.* 72:21-73:3.) Ash does not recall this meeting.

*December 10, 2003 - Plaintiff's Termination*

At the end of Plaintiff's sixty-day probationary period, on or around December 10, 2003, AG's Human Resources Manager contacted Waller and asked Waller if they were going to retain Plaintiff. (Waller Dep. 82:8-13.) Waller asked Conner about Plaintiff's performance. According to Waller, Conner cited several problems with Plaintiff's performance, including working too slow and visiting too much.[6] After this discussion, Waller "felt like between that and the money Joe was making that it wasn't going to [be] worth the hassle and I decided to let him go." (*Id.* 82:8-24.) Waller called Plaintiff to his

---

[6] As discussed below, Conner's testimony is, at least in parts, inconsistent with Waller's testimony regarding this conversation.

7

office and informed Plaintiff they were "going to have to let him go." (Boyles Dep. 89:10-12.) Plaintiff then asked to speak to Ash, and Ash agreed. Plaintiff told Ash he was willing to accept less money because Conner had been named the lead man. After some discussion regarding a lower salary, Plaintiff was terminated.

## II.      Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* (citation omitted). However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in his complaint but must "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). In the context of a case brought under federal employment laws, the trial court must "make a judgment as to whether the evidence . . . could persuade a reasonable jury that the employer had discriminated against the plaintiff." *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 798 (10th Cir. 1998).

## III.     Defendant's Motion for Summary Judgment - ADEA Claim

### A.      *Prima Facie Case*

Plaintiff admits he does not have direct evidence that age was a determining factor in his termination. Instead, Plaintiff relies on the proof scheme established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973), which is applicable to ADEA cases. *See Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1420 (10th Cir. 1991).

8

"Under that proof scheme, to set forth a prima facie case of age discrimination, a plaintiff must ordinarily prove that '(1) the affected employee was within the protected age group; (2) [he] was doing satisfactory work; (3) [he] was discharged despite the adequacy of this work; and (4) a younger person replaced [him].'" *Id.* AG challenges Plaintiff's ability to prove the second and third elements of his prima facie case.

### 1.    Satisfactory Work

AG argues Plaintiff cannot show that he was "doing satisfactory work." AG's argument is based on, *inter alia*, Plaintiff's low ranking on the depth chart, Ash's meetings with Plaintiff regarding his poor performance, and Conner's testimony regarding Plaintiff's performance problems, which included being too slow and visiting too much on the job. Based on the Tenth Circuit's reasoning in *Denison*, in which the court examined similar arguments regarding a plaintiff's performance at the prima facie stage, the Court concludes that AG's arguments in this case "go to the weight of the evidence of satisfactory performance" and not to Plaintiff's "initial burden to produce such evidence" at the prima facie stage. *Id.* If the Court were to evaluate AG's evidence of poor performance at this stage, it would be "unnecessarily collaps[ing] the steps suggested by *McDonnell Douglas* by shifting considerations which are more appropriate to the employer's rebuttal phase to the earlier requirement that the employee demonstrate competence to perform the specified work." *Id.* Evaluation of AG's performance evidence is particularly inappropriate at this stage because AG's evaluations of Plaintiff's work are based primarily on subjective criteria, which are "particularly easy for an employer to invent in an effort to sabotage a plaintiff's prima facie case." *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1510 (10th Cir. 1997) (where promotion decisions were determined by subjective evaluation, rather than objective criteria

such as height or weight requirements, plaintiff's evidence was sufficient to establish a prima facie case).

Instead, in order to meet his burden at the initial stage, Plaintiff must merely introduce "some evidence of good performance." *Denison*, 941 F.2d at 1420.  Plaintiff must show that "his performance was of sufficient quality to merit continued employment, thereby raising an inference that some other factor was involved in the decision to discharge him." *Id.* (quotations omitted).  In this case, the Court relies on (1) Plaintiff's own testimony that he was outperforming other members of the Skid Department (Boyles Dep. 93:21-94:5); (2) Charley Bright's testimony that, at least while Charley Bright worked there, Plaintiff's performance was satisfactory (Charley Bright Dep. 37:15-40:10); (3)  Charley Bright's testimony that, in his opinion, Plaintiff would have ranked "near the top" of the depth chart prepared by Conner (*id.* 69:22-69:11); (4) Conner's testimony that Plaintiff was "doing okay" when asked about Plaintiff's performance by Waller at the end of Plaintiff's probationary period (Waller Dep. 67:11-68:5.); and (5) Plaintiff's extensive experience as a welder and supervisor of welders prior to being hired by AG (Boyles Dep. 1-25).  The Court finds this evidence sufficient to meet this element of the prima facie case for purposes of summary judgment.  *See Thomas*, 111 F.3d at 1510 (stating that plaintiff's burden as to this element may be met "through plaintiff's own testimony and that of co-workers who were in a position to know the plaintiff's qualifications); *cf. Beard v. Seagate Tech.*, 145 F.3d 1159, 1166 n.3 (10th Cir. 1998) (stating that plaintiff's own testimony insisting that his work was satisfactory was sufficient to satisfy the *fourth* element of a prima facie case requiring a plaintiff to show he was treated less favorably than younger employees).

10

    2.    <u>Discharge</u>

AG contends that, in the final meeting with Ash, Plaintiff was given the opportunity to continue employment at a lower rate of pay but refused to do so, and therefore Plaintiff voluntarily resigned.  However, the Court finds ample evidence in the record to support a finding that Plaintiff was discharged.  First, there are numerous instances in the record in which Defendant has expressly argued and contended that Plaintiff was terminated or discharged.  (*See, e.g.* Def.'s Mot. for Summ. J. ¶¶ 9, 19, 20; Ex. 20 to Def.'s Mot. for Summ. J.)  Second, it is undisputed that Plaintiff was initially told he was being "let go" by Waller.  (*See* Waller Dep. 88:19-25.)  It was only upon Plaintiff's request to see Ash and Plaintiff's attempt to maintain employment at a lower rate that Ash and Plaintiff engaged in further discussion regarding the terms of his employment.  Third, even assuming Plaintiff had not already been terminated at the point he discussed a different rate of pay with Ash, Plaintiff's testimony regarding these negotiations creates a genuine question of fact as to whether he was actually given the opportunity to maintain employment.  Plaintiff testified:

> A.    You know, I can't really remember exactly what all went on, but it come to a conclusion that I just as well shut my mouth and go on, because that - nothing like that was going to ever happen of me retaining my job.
>
> . . .
>
> Q.    . . . Isn't it true that AG equipment - somebody for AG Equipment during that meeting agreed that if you wanted to work for $15 an hour, you could have kept your job?
>
> A.    I don't think so.
>
> . . .
>
> A.    . . . I knew from everything that was being said, that I wasn't going to be able to work there anymore, so I just shut my mouth.

(Boyles Dep. 102-103:7.)  The Court finds that Plaintiff has presented more than sufficient evidence to survive summary judgment on the issue of whether he was "discharged" by AG.

      B.    *Pretext*

AG has offered the following legitimate, non-discriminatory reason for Plaintiff's discharge:  "The non-discriminatory basis for the termination of [Plaintiff's] employment was that during his 60 day probationary period, he simply did not perform to the level that was expected of him and for which he was being paid."  (*See* Def.'s Mot. for Summ. J. ¶ 9.)  After an employer offers a legitimate, non-discriminatory reason for the termination, a plaintiff "may defeat summary judgment by presenting sufficient evidence such that a reasonable jury could conclude that the proffered nondiscriminatory reason for the employment action is pretextual, that is, 'unworthy of belief.'"  *Simms v. Okla.*, 165 F.3d 1321, 1328 (10th Cir. 1999).  "A plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Green v. New Mexico*, 420 F.3d 1189, 1192-93 (10th Cir. 2005) (internal quotation omitted).

Relevant to this case, the Tenth Circuit has found that the following types of evidence may be used to demonstrate pretext:  (1) "remarks exhibiting bias which refer directly to the plaintiff," *Tomisic v. State Farm Mutual Auto. Ins. Co.*, 85 F.3d 1472, 1479 (10th Cir. 1996); (2) failing to follow "normal" company procedures in making the adverse employment decision, s*ee Metz v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 39 F.3d 1482, 1492 n.12 (10th Cir. 1994); (3) the use of subjective criteria in evaluating performance, *see Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002); and

(4) inconsistencies in an employer's explanation of the adverse employment action, *Tomisic*, 85 F.3d at 1479.  The Court will address each category of pretext evidence in turn.

### 1.      Ageist Comment by Ash and Ash's Deposition Testimony

At some point during or near the time of Plaintiff's hiring,[7] Ash asked Plaintiff his age, discovered Plaintiff's age, and made a comment to the effect that Plaintiff was "too old" to work in the Skid Department.  This comment was directed at Plaintiff and is precisely the type of ageist comment that supports an inference of pretext.  In addition to the comment, AG's letter response to the EEOC's investigation states that, while discussing Plaintiff's employment with Charley Bright, Ash "expressed his concerns regarding Mr. Boyles' ability to handle the heavy work and demanding pace required on the skid crew."  (Ex. 20 to Def.'s Mot. for Summ J.)  When asked in his deposition why he had a concern that Plaintiff would not be able to handle the work, Ash stated "[b]ecause, in my opinion, he would be unable to do it, because it's a tough job, is all I can tell you."  (Ash Dep. 147:9-11.)  Ash had this opinion despite the fact that there was nothing about Plaintiff's appearance that led Ash to believe Plaintiff was not physically fit.  (*Id.* 149:4-150:13.)  Ash did not have concerns that a thirty-five year old would be able to handle the physical labor associated with the Skid Department.  (*Id.* 148:21-24.)  This is evidence of age stereotyping.

If Plaintiff would not have been hired, Ash's comment in the break room and Ash's testimony explaining the comment would be persuasive evidence of discriminatory hiring practices, *i.e.*, failing to hire Plaintiff based on the assumption that someone his age could not perform the physical requirements of the job in the Skid Department.  However, Plaintiff

---

[7] As explained above, the Court finds genuine factual disputes regarding whether Ash made the comment before or after Charley Bright officially hired Plaintiff.

was hired and was given an opportunity to prove himself during his sixty-day probationary period.  AG argues that the comment loses its force because Plaintiff was in fact hired.

After careful consideration of the record, the Court concludes that Ash's comment at or around the time of hiring may be viewed by a rational factfinder as evidence of pretext. In this case, the primary person responsible for bringing Plaintiff to the company and hiring him at "top wage" with the intention that he become lead man of the Skid Department was Charley Bright.  Although there is evidence that Ash approved Charley Bright's decision to hire Plaintiff, it is clear that Charley Bright was the instrumental person in making the hiring decision.  It could also be inferred that Ash believed Conner, and not Plaintiff, should have been lead man of the Skid Department because Plaintiff was too old, and that Ash took steps to oust Plaintiff.  After Charley Bright left, Ash took the following actions that could also be considered consistent with age stereotyping of Plaintiff:  (1) requesting that Conner prepare the depth chart specifically for the purpose of evaluating Plaintiff, (2) deciding to terminate Plaintiff based on the depth chart,[8] and (3) eventually ratifying the decision of Waller to terminate Plaintiff and/or being directly involved in the decision to terminate Plaintiff.[9]  All of these actions occurred within sixty days of Ash making the ageist comment.  Under these circumstances, the Court believes the ageist comment has a sufficient nexus to the termination decision such that "a jury could infer from [the remark] in the total context presented that unlawful bias was a motivating factor in [AG's] decision."  *Tomisic*,

[8]  Ash did change his mind about this decision, which removes some of this fact's persuasive value on the issue of pretext.  The Court rejects AG's position, however, that the fact has no evidentiary value whatsoever simply because Ash changed his mind.

[9]  As discussed below, there are genuine questions of fact regarding whether and to what extent Ash played a role in Plaintiff's departure from AG.

14

85 F.3d at 1479 (where remarks were directed to plaintiff individually and maker of remarks made a recommendation to the decision maker, the remarks had a sufficient nexus to the adverse employment action).

AG also contends the ageist comment does not evidence pretext because Ash was not a decision maker with respect to Plaintiff's termination.  However, the Court finds this to be a genuine dispute of fact.  First, Ash obviously had the authority to terminate Plaintiff, since he had unilaterally decided to do so thirty days prior.  Second, Ash testified that Waller consulted Ash regarding the decision to terminate Plaintiff, asking him "[w]hat do you want to do about Joe Boyles?"  (Ash Dep. 63:10-22.)  Although Ash contends he left the decision to Waller, the fact that he was consulted is evidence that he had some control over Plaintiff's employment.  Third, it is undisputed that Ash was involved in, and was a decision maker regarding, a subsequent discussion between Ash, Waller, and Plaintiff in which Plaintiff attempted to keep his job by offering to receive a lower salary.  All parties agree that Ash was involved in this decision.  Finally, Plaintiff testified that, at the time of Plaintiff's termination, Waller stated, "Personally, I don't want you to go."  (Boyles Dep. 96:22-97:11.) This led Plaintiff to believe that "someone above him was involved in all of this too."  (*Id.* 97:17-23.)  Plaintiff then asked to speak to Ash and the salary discussion ensued.  Under these circumstances, the Court believes there is a question of fact as to whether Ash was a decision maker regarding Plaintiff's alleged termination.

Therefore, although there are questions of fact that will impact the weight to be given Ash's comment, the Court believes there is a sufficient nexus between the comment and the termination decision to raise an inference of pretext.

2.    Ash's Request for Depth Chart

Ash asked Conner, whom he believed to be the lead man of the Skid Department, to prepare a depth chart for the purpose of evaluating Plaintiff's performance. (Ash Dep. 39:4-20.)  Depth charts are not routinely completed at AG.  Waller could remember only one other time that a depth chart was completed, (*see* Waller Dep. 35:10-13), and AG could not produce as evidence any other "depth charts" that had been completed.  Thus, Plaintiff has presented sufficient evidence that use of a depth chart to evaluate one particular employee's performance is at least somewhat irregular.  Tenth Circuit case law recognizes that failure to follow "normal procedures" for dealing with employee performance problems can be evidence of pretext. *See Metz*, 39 F.3d at 1492 n.12.  AG did not appear to have any "normal procedures" or published policies it would follow if a member of management was concerned about an employee's performance.  Therefore, it is difficult to evaluate whether Ash and others followed "normal" procedures in their treatment of Plaintiff. *See Simms*, 165 F.3d at 1329 (allegations of procedural irregularities are not probative of pretext because they were consistent with published policies).  However, the Court believes that Ash's ordering of a depth chart to *specifically evaluate* Plaintiff's performance could be viewed as support for Plaintiff's age-discrimination theory.

AG contends that Ash ordered the depth chart to evaluate Plaintiff because he was hired under extraordinary circumstances (to become lead man) and was making an extraordinarily high wage ($21.00/hour).  However, the Court believes this is a factual dispute that must be resolved by the jury.  AG also argues the depth chart is not evidence of pretext because it did not directly form the basis of the termination decision, which was made one month after the chart was created.  Again, the Court finds that the closeness in

time between the depth chart, Ash's decision to terminate Plaintiff, Ash changing his mind about terminating Plaintiff, and Plaintiff's eventual termination, makes the depth chart potentially probative evidence of pretext.

### 3.   Use of Subjective Evaluation Criteria

AG contends Plaintiff was terminated because he did not perform "to the level expected of him and for which he was being paid." The only written evaluation of Plaintiff's performance is the depth chart specifically requested by Ash in order to evaluate Plaintiff. The depth chart led to the two "performance" meetings with Ash. Conner prepared the depth chart in one evening. Conner based the depth chart on his observation of his fellow workers during a time in which he was unaware he was "lead man" of the Skid Department and therefore had not been specifically charged with the task of observing his co-workers' performance. Conner's stated criteria for the depth chart are "work ethic, ability to work unsupervised, production output, ability to work with others, and quality of work." (Ex.1 to Def.'s Mot. for Summ. J.) However, Conner, and all other AG employees, testified that there are no objective methods, such as computer-generated statistics or production output measurements, to evaluate a welder's performance in the Skid Department. Instead, Conner's conclusions in the depth chart are based on his subjective observation and opinion. The depth chart was not accompanied by written comments or further explanation. Other than the depth chart, there are no written performance evaluations of Plaintiff in the record.

With respect to the evaluation performed by Waller at the end of the sixty-day probationary period, this involved Waller asking Conner of his opinion of Plaintiff's work based on Conner's observations. (Waller Dep. 82-85.) Therefore, AG's final evaluation of Plaintiff's performance leading to his termination was also based on subjective criteria. The

Court finds that the use of purely subjective criteria in evaluating Plaintiff's performance, viewed in context of the evidence as a whole, contributes to Plaintiff's ability to show pretext in this case.  *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002) ("Absent evidence that [Defendant's] system of ranking and evaluation relies on objective criteria, [plaintiff] has satisfied his burden to demonstrate pretext . . . .").[10]

4.    Possible Inconsistencies in Testimony of Waller and Conner

With respect to the reasons for the final decision to terminate Plaintiff at the end of his probationary period, AG employees offered somewhat inconsistent testimony.  Waller testified that he asked Conner about Plaintiff's performance and that Conner "had some concerns about [Plaintiff's] job performance." (Waller Dep. 83:15-17.)  Specifically, Waller testified that Conner identified problems of Plaintiff not working fast enough, visiting too much, and trying to tell people to do something different than Conner had instructed them. (*Id.* 83-84.)  In contrast, when asked about Plaintiff's performance, Conner testified that he told Waller that Plaintiff was "doing okay" and that Plaintiff's performance had "stabilized." (Deposition of Tim Conner ("Conner"), Def.'s Mot. for Summ. J., Ex. F 67:20-24.)[11]

_____

[10]   The Court notes that *Garrett*'s holding has been somewhat limited by the Tenth Circuit's recent decision in *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186 (10th Cir. 2006).  In *Pippin*, the court held that lack of objective criteria does not, standing alone, suffice to create an issue of pretext and that, in *Garrett*, the aggregate evidence raised a genuine doubt about the employer's motivation.  *Id.* at 1195.  Here, as in *Garrett*, the fact that only observation and opinion, and no objective criteria, formed the basis of Plaintiff's performance evaluations could contribute to a jury's conclusion that AG's proffered reason for termination was a pretext for age discrimination, considering all evidence in the aggregate.

[11]   Conner did testify, in other portions of his deposition, regarding specific performance problems.  (*See id.* 33-35; 81:20-23.)  However, when asked point blank what he told Waller, he testified that he said Plaintiff was "doing okay."  (*Id.* 67:20-24.)

Further, Conner did not tell Waller that he believed Plaintiff should be fired. (*Id.* 69-5-9; 84:4-6.) This is sufficient to cause a rational factfinder to question whether Waller had other motivation to terminate Plaintiff, such as instruction from Ash.

     5.     Summary of Pretext Evidence to Defeat Summary Judgment

In sum, the Court finds the following evidence sufficient to create a genuine issue of material fact as to pretext in this case: (1) the blatantly ageist comment by Ash, (2) the somewhat abnormal request for a "depth chart" by Ash to evaluate Plaintiff's performance, (3) the fact that all evaluations of Plaintiff's performance were based on wholly subjective criteria, and (4) inconsistencies in testimony of AG employees regarding the reason for Plaintiff's termination. The Court observes that the comment by Ash is most crucial because it raises the inference of age-related discrimination and age-related animus by the owner of AG. Without it, the other pretext evidence would have less meaning because it would not be tied to evidence suggesting age-based discrimination.[12]

## IV.    Defendant's Motion for Summary Judgment - *Burk* Tort Claim

Plaintiff's second cause of action is for wrongful termination in violation of the public policy of Oklahoma, as set forth in the Oklahoma Anti-discrimination Act, OKLA.

---

[12] Plaintiff has also submitted evidence of "better treatment" of similarly situated but younger employees. AG argues that no employees were similarly situated to Plaintiff because he was on probation and because of the higher standards to which he was being held based on his higher salary and "lead man" potential. The Court need not resolve these issues because Plaintiff has submitted other pretext evidence that is sufficient to defeat summary judgment. Plaintiff has also submitted evidence that Charley Bright was subject to discriminatory treatment based on his age. This is in contrast to Charley Bright's testimony, which was that he "voluntarily left" AG. Again, the Court need not resolve this issue here because Plaintiff has submitted other pretext evidence that is sufficient to defeat summary judgment.

STAT. tit. 25, § 101.  A claim for wrongful termination in violation of public policy is known under Oklahoma law as a *Burk* tort.[13]  Based on the Oklahoma Supreme Court's decisions in *List v. Anchor Paint Manufacturing Company*, 910 P.2d 1011 (Okla. 1996) and *Clinton v. State of Oklahoma ex rel. Logan County Election Board*, 29 P.3d 543 (Okla. 2001), it has been settled law among Oklahoma federal district courts that a *Burk* tort is not available in employment discrimination cases due to the existence of adequate federal remedies.  *See, e.g.*, *Bolin v. Okla. Conference of the United Methodist Church*, 297 F. Supp. 2d 1293, 1299 (N.D. Okla. 2005) (Title VII); *Hale v. MCI, Inc.*,  No. CIV-04-1297, 2006 WL 223829, at * 2 (W.D. Okla. Jan. 25, 2006) (ADEA) ("Taken together, the holdings in *List* and *Clinton* make it clear that the ADEA is an adequate federal statutory remedy, which precludes the assertion of a state law public policy tort claim for age discrimination.").

Plaintiff argues that a recent Oklahoma Supreme Court case changes this rule and holds that a *Burk* tort is now available in an age discrimination case.  In *Saint v. Data Exchange, Incorporated*, 145 P.3d 1037 (Okla. 2006), the Oklahoma Supreme Court answered a certified question from the Northern District of Oklahoma, which asked whether there is "a common-law *Burk* tort remedy for state age discrimination claims arising under the operation of the Oklahoma Constitution . . . and the . . . Oklahoma Anti-discrimination Act."  *Id.*  The Oklahoma Supreme Court answered in the affirmative:  "Age-discrimination victims are part of the employment discrimination class, and as such must be afforded the same rights as the other members of the class. Therefore we find that there is a *Burk* tort remedy for those who allege employment age discrimination."  *Id.* at 1039.

---

[13]  The case of *Burk v. K-Mart Corporation*, 770 P.2d 24 (Okla. 1989), established this public policy tort.

This Court will follow the existing decisions in Oklahoma federal district courts, which have interpreted *Saint* to hold that a *Burk* tort claim may be brought with an ADEA claim. *See Seeber v. Williams*, No. 04-CV-451-CVE, 2006 WL 2524249 (N.D. Okla. Aug. 28, 2006) ("[T]he Oklahoma Supreme Court's recent decision in *Saint v. Data Exchange . . .* allows a plaintiff to pursue a *Burk* claim and an ADEA claim."); *Rutty v. Equi-Management Svcs., Inc.*, No. CIV-05-1272-F (W.D. Okla. Jan. 9, 2007) ("The Oklahoma Supreme Court held in *Saint v. Data Exchange Inc.* . . . that a *Burk* tort claim . . . for wrongful termination from employment may be asserted by a plaintiff who alleges employment discrimination on the basis of age."); *see also* Mark Edgar Hammons, Sr., *Saint v. Data Exchange Inc.:  Discrimination Claims Return to State Court*, 78-2 OKLA. BAR J. 140 (Jan. 13, 2007) ("[T]he Oklahoma Supreme Court . . . held that victims of age discrimination had a state *Burk* tort remedy notwithstanding that such discrimination was also covered by the [ADEA].").[14]  Accordingly, Plaintiff's *Burk* tort claim will also proceed to trial**.**

---

[14]  Although the Court will follow other Oklahoma district courts' interpretations of *Saint*, the Court notes there is some speculation among the Oklahoma bar regarding whether *Saint* intends to overrule *List* and hold that the ADEA is not an adequate federal remedy, or whether the case is limited to the adequacy of the state remedy for age discrimination under the Oklahoma Anti-discrimination Act.  *See* Michael W. Bowling, *Saint v. Data Exchange*: *A Sea Change or Business as Usual for the Public Policy Tort Exception to Employment At-Will*? 78-2 OKLA. BAR J. 137 (Jan. 13, 2007) (explaining arguments that could be made in support of each interpretation).

V.      **Plaintiffs' Motion for Summary Judgment**

Plaintiff Boyles and Plaintiff EEOC have moved for partial summary judgment on AG's first, second, and seventh affirmative defenses. Based on the Court's denial of AG's motion for summary judgment, AG's first affirmative defense of failure to state a claim is moot. With respect to the other two defenses challenged in Plaintiffs' motion, which relate to Plaintiff Boyles' probationary status and the adequacy of the EEOC investigation, the Court orders AG to file a statement no later than Monday, February 12, 2007, regarding whether and to what extent it actually intends to assert these as "affirmative defenses" at trial. If necessary, the Court will address these issues at a later date.

VI.     **Conclusion**

Defendant AG Equipment Co.'s Motion for Summary Judgment (Docket No. 49). is DENIED;[15] and the Motion of Plaintiff EEOC and Plaintiff Joe Boyles for Partial Summary Judgment (Docket No. 42) is HELD IN ABEYANCE. AG is ORDERED to file a statement in response to this Order no later than Monday, February 12, 2007.

**ORDERED this 5th day of February, 2007.**

_Terence Kern_
_____
**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

---

[15]  In reaching its decision on AG's motion for summary judgment, the Court considered all evidence and argument presented by AG. Plaintiff's outstanding motions to strike certain briefing filed by AG (Docket Nos. 54 and 87) are DENIED.